# HEIM *v.* McCALL.

**ERROR TO THE COURT OF APPEALS OF THE STATE OF NEW YORK.**

No. 386.   Argued October 12, 1915.—Decided November 29, 1915.

The highest court of the State not having commented on the question of right of plaintiff as a taxpayer to maintain the action although the same was raised, this court may—even not required so to do—assume that the right existed.

It belongs to the State, as guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which

it will permit public work to be done on its behalf, or on behalf of its municipalities. *Atkins* v. *Kansas*, 191 U. S. 207.

No court can review the action of the State in regard to prescribing conditions upon which its public works shall be done, as regulations in that respect suggest only considerations of policy with which the courts have no concern. *Atkins* v. *Kansas*, 191 U. S. 207.

This court must follow the decisions of the state court that a provision of its general laws in regard to employment of labor on public work applies to its municipalities and to the particular work involved.

In this case, *held* that neither the municipality, nor its contractors nor a taxpayer on its behalf, could assert the rights of an individual, proprietary in character, as against the State itself in determining who should be employed on public work authorized by the State itself.

The equality of rights assured by Articles I and II of the Treaty of 1871 with Italy is in respect of protection and security for person and property.

The provisions in § 14 of the Labor Law of 1909 of New York, that only citizens of the United States shall be employed on public works and that preference shall be given to citizens of that State is not unconstitutional under the privilege and immunities clause of the Constitution of the United States or under the equal provision or due process clause of the Fourteenth Amendment thereto, or as violative of the Treaty of 1871 with Italy.

214 N. Y. 629, affirmed.

BILL in equity to restrain the Public Service Commission for the first district of the State of New York from declaring certain contracts for the construction of portions of the rapid subway system of the City of New York void and forfeited for violation of certain provisions inserted in the contracts in pursuance of § 14 of the Labor Law (so-called) of the State. Laws 1909, ch. 36, Consol. Laws, ch. 31. It reads as follows:

"Section 14. Preference in employment of persons upon public works.—In the construction of public works by the State or a municipality, or by persons contracting with the state or such municipality, only citizens of the United States shall be employed; and in all cases where laborers are employed on any such public works, prefer-

erence shall be given citizens of the State of New York. In each contract for the construction of public works a provision shall be inserted, to the effect that, if the provisions of this section are not complied with, the contract shall be void. . . ." [1]

It is provided that a list of contracts theretofore made, with the names and addresses of the contractors, shall be filed in the office of the Commissioner of Labor, and when new contracts are allowed the names and addresses of such new contractors shall likewise be filed and, upon demand, each contractor shall furnish a list of subcontractors in his employ. Each contractor is required to keep a list of his employés which shall set forth whether they are naturalized or native born citizens of the United States. A violation of the section is made a misdemeanor.

The case went off on demurrer and it is therefore necessary to give a summary of the bill, which we do in narrative form, as follows:

Heim is a property owner and taxpayer of the State of New York. The defendants are the acting Public Service Commissioners for the First District of the State of New York and have been constituted and are the Public Service Commission of that district.

The Board of Rapid Transit Railroad Commissioners for the City of New York under the laws of the State (referred to as the Rapid Transit Act) in 1896 laid out and established a route for said railroad in the city, which was subsequently constructed, equipped and op-

---

[1] Section 14 of the Labor Law was amended by act of March 11, 1915, ch. 51, Laws of New York, 1915, as follows:

"SECTION 14. Preference in employment of persons upon public works.—In the construction of public works by the State or a municipality, or by persons contracting with the State or such municipality, preference shall be given to citizens over aliens. Aliens may be employed when citizens are not available. . . ."

erated.   Afterwards other routes were established, constructed, equipped and operated.

These routes were located in the boroughs of Manhattan and the Bronx and Brooklyn, and since 1912 and prior thereto have been leased and operated by the Interborough Rapid Transit Company, referred to as the Interborough Company.   There has been a like lease of roads in Brooklyn by the Consolidated Railroad Company, called the Brooklyn Company.

The Board of Rapid Transit Commissioners, acting under the laws of the State, decided that other rapid transit railroads were necessary, and determined and established routes and the general plans for the construction thereof.

The lines are described and respectively called Interborough lines and Brooklyn lines.

The Board and the Public Service Commission contemplated that such extension and additions would form, with the existing Interborough and Brooklyn lines, a complete and comprehensive rapid transit system for the accommodation of the entire city.   And the construction of such roads was deemed and was and has been an imperative necessity for the comfort and convenience of the residents and taxpayers of the city.

The cost of construction of such new roads was upwards of $235,000,000 and their equipment $44,000,000.   The city had no available money and could not borrow the necessary moneys for a large part of such construction or equipment without exceeding its legal and constitutional debt limit by many million dollars.

To utilize the old with the new systems upon a 5-cent fare basis and to overcome the difficulties and delays for lack of funds and accomplish the early construction and operation of the system on the best possible terms for the city, negotiations were entered into between the Public Service Commission and the city authorities on the one

part and the Interborough Company and the Brooklyn Company on the other part with a view of formulating and entering into contracts with the companies for the provision of funds for the construction and operation of roads.

A form of contract was finally agreed upon and a contract was duly signed, executed and delivered by the Interborough Company on the one part and the Public Service Commission in behalf of the city on the other part, on or about March 19, 1913.

As a result of the negotiations another contract was entered into with the New York Municipal Railway Company, which had been formed in the interest of the Brooklyn Company, whereby the latter company agreed to contribute toward the cost of construction and equipment and to lease and operate a portion of the roads in conjunction with the then existing system. There is an enumeration of the provisions of the contracts and the amounts to be contributed by the companies and for the lease of the routes.

The contracts were made a part of the public records and approved by the Board of Estimates and Apportionment and other proper authorities before execution.

The Public Service Commission has let and awarded each of the contracts for construction of the new routes and the Interborough Company became a party to many of them for the purpose stated in the contracts, that is, "solely for the purpose of paying out a part of its contribution towards the cost of construction of the said respective routes."

The new routes were duly approved by the proper authorities and the Public Service Commission in accordance with the general plan of the routes, either obtaining the consent of the property owners along the routes or, failing to obtain such consent, having commissioners appointed by the Appellate Division of the Supreme Court to deter-

mine and report whether the routes were to be constructed and operated according to the plans adopted. The commissioners reported favorably and their report was confirmed by the court, and the general plans "thereafter constituted and now are the routes and general plans of the so-called Dual System of Rapid Transit Railroads herein referred to."

In pursuance of the Rapid Transit Act the Public Service Commission prepared plans and specifications for the construction of the major portion of said routes in accordance with the general plans, and thereafter, before awarding any contract, advertised for proposals in the form of an invitation to contractors and in compliance with the Rapid Transit Act and the acts amending and supplementing it.

Bids were duly made and contracts duly awarded and approved by the proper authorities.

Each of the contracts contained the following provisions: "In obedience to the requirements of section 14 of the Labor Law, it is further provided that if the provisions of said section 14 are not complied with, this contract shall be void." A provision in identical language was contained in the invitation to bidders.

The requirement (it is alleged) both in the proposals and contracts is unconstitutional, void and of no effect, in that it is in conflict with § 2 of Article IV of the Constitution of the United States (that is, "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States") and with § 1 of Article XIV of the amendments to the Constitution, and with other sections and provisions; also in violation of the constitution of the State and in conflict with the treaty between the United States and Italy and various other treaties which contain "the Most Favored Nation Clause"—in other words, providing that the citizens of such countries shall enjoy all the privileges, rights and

immunities which the citizens of countries most favored in any existing treaty with the United States enjoy.

All of the contractors promptly made the necessary preparations for the execution of their contracts and all are in the process of performance at different stages, some of them having been performed to the extent of 75% and all performed to a very large extent. In no instance are any of the contractors in default.

In the course of construction each of the contractors has constantly employed and now employs a large number of laborers and mechanics who are residents of the city of New York but who were born in Italy and are subjects of its King, and also employed laborers who, though citizens of the United States, were not citizens of New York, and did not give preference to citizens of the State of New York over such laborers so employed who were not citizens of the State but citizens of the United States.

At the time of the proposals it was known to be and is necessary to employ a large number of such subjects of the King of Italy and citizens of other States and of other countries to perform said contracts within the time and at the prices stated in order to keep the construction and equipment of the Dual System within the total amount provided and specified in the contracts and plans.

The treaty between the United States and Italy of 1871 provides that the subjects of the King of Italy residing in the United States shall have and enjoy the same rights and privileges with respect to persons and property as are secured to the citizens of the United States residing in the United States.

At no time since the letting of such contracts has there been available a sufficient force or number of laborers, citizens of the United States or of the State of New York, to perform the work in accordance with such contracts; and no question was raised until a few days since of the right of the contractors to employ alien laborers, which

the contractors believed that they had a right to do, and they regarded the provision of the law and of the contract prohibiting the same as in effect null and void.

Within the past ten days complaint has been made to the Public Service Commission of the violation of the law and the alien labor provision in the contracts, and the Commission has threatened to refuse to approve further monthly estimates of amounts payable to contractors, thus depriving them of the means of prosecuting the work and the right to perform the same; indeed, have refused to approve certain monthly estimates, and, unless enjoined, will declare such contracts void and terminate the same.

The termination of the contracts will result in irreparable loss and damage and waste of money to the city, the work will be delayed or not done or the cost will be enormously increased because the supply of labor will be diminished, resulting necessarily in the diminution of labor available for the work which will greatly protract the same; and litigation with the contractors will be caused. Also damage will result because of the fact that a large percentage of capital and money necessary for the work is supplied by third parties under contract with the city to supply the same, which contracts were based upon estimates made in advance, and said contracts may be invalidated and the purpose for which they were made defeated.

The total capital to be supplied was $250,000,000, of which the said third parties agreed to supply $115,000,000 and the city the balance. If the contracts be declared void the capital so to be supplied will be inadequate for the work and the money already supplied by the city and the said third parties will have been wasted.

Injunction is prayed against declaring the contracts void and forfeited and refusing to prepare and certify vouchers of the amount of monthly estimates for work done.

There was a demurrer to the bill, which was sustained by the Supreme Court, and injunction denied. The judgment was reversed by the Appellate Division and an injunction ordered, which action was reversed by the Court of Appeals and the bill ordered dismissed. 214 N. Y. 629.

*Mr. Thomas F. Conway* for plaintiff in error:

This action is properly brought by plaintiff as a taxpayer, to prevent threatened illegal acts of the defendant Public Service Commission to cancel contracts aggregating over $100,000,000 made by the city for the construction of subways, and to prevent the loss and damage that would result to the city if such contracts were canceled. General Munic. Law, § 51; Code Civ. Proc., § 1925; Charter of City of New York, § 59.

Section 14 of the State Labor Law, prohibiting the employment of aliens upon public works and requiring that preference be given to citizens of the State over those of other States, is void as offending against both constitutional provisions and existing treaties.

The power granted to the city by statute, in the exercise of which it is constructing the subways, constitutes it a private railway corporation and in their construction and operation it is exercising no governmental function. It is made by statute both proprietor and owner of the road. Rapid Transit Act, ch. 4, N. Y. Laws 1891, as amended; *Re Rapid Transit Commissioners,* 197 N. Y. 81.

The State has no interest in the moneys which the city was required to provide for the construction of such subways, nor has the State any power to control the city in its expenditures. The city possesses the same unrestricted right, both in the selection of its employés and to contract as would a private corporation or private individual engaged in a similar business. It is not acting as the agent of the State. See statute and case cited. Also

*People* v. *Detroit,* 28 Michigan, 227; *People* v. *Ingersoll,* 58 N. Y. 1; *People* v. *Fields,* 58 N. Y. 491; *Insurance Co.* v. *Morse,* 20 Wall. 445; *Hunter* v. *Pittsburgh,* 207 U. S. 161, 179.

Section 14 of the Labor Law, therefore, which as enforced deprives it of both such rights, is plainly in violation of the provisions of the Fourteenth Amendment. *Insurance Co.* v. *Morse,* 20 Wall. 445; *Hunter* v. *Pittsburgh,* 207 U. S. 161; *Dartmouth College* v. *Woodward,* 4 Wheat. 517; *New Orleans* v. *Water Works Co.,* 142 U. S. 79; *Loan Association* v. *Topeka,* 20 Wall. 654.

Section 14 is also invalid because it deprives the contractors with the city of freedom of contract guaranteed by the Constitution and of property rights by forfeiting their contracts for noncompliance with its provisions. Cases *supra* and *Hurtado* v. *People,* 110 U. S. 516; *Loan Association* v. *Topeka,* 20 Wall. 655; *Yick Wo* v. *Hopkins,* 188 U. S. 356; *Barbier* v. *Connolly,* 113 U. S. 27; *Butchers' Union* v. *Crescent City Co.,* 111 U. S. 746; *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540; *Gulf &c. R. R. Co.* v. *Ellis,* 165 U. S. 150; *Ward* v. *Maryland,* 12 Wall. 430; *United States* v. *Martin,* 94 U. S. 400; *Parrott's Case,* 1 Fed. Rep. 481.

Section 14 also offends against the provisions of Art. 4, § 2, United States Constitution, guaranteeing to citizens of each State all privileges and immunities of citizens of the several States. *Ward* v. *Maryland,* 12 Wall. 412; *Slaughter House Cases,* 16 Wall. 35; *Paul* v. *Virginia,* 8 Wall. 868.

Its violation in this respect is emphasized by the fact that the courts of the State have uniformly enforced in favor of its own citizens the very rights denied to aliens and to citizens of other States by the statute in question. *Matter of Jacobs,* 98 N. Y. 98; *Bertholf* v. *O'Reilly,* 74 N. Y. 509; *People* v. *Marks,* 99 N. Y. 377; *People* v. *Williams,* 189 N. Y. 131.

As the city had accepted and acted upon the power granted it by the Rapid Transit Act for the construction and operation of its subways prior to the enactment of said section of the Labor Law, it acquired contractual and vested rights to extend and complete the same which were entitled to protection under Art. 1, § 10, of the Constitution but which were invaded and impaired by the act in question. *Russell* v. *Sebastian,* 233 U. S. 195; *Woodhaven Gas Co.* v. *Deehan,* 153 N. Y. 533; *Van Hoffman* v. *Quincy,* 4 Wall. 535; *St. Louis* v. *West. Un. Tel. Co.,* 148 U. S. 92; *Grand Trunk Ry.* v. *South Bend,* 227 U. S. 544; *Thomas* v. *Railroad Co.,* 101 U. S. 71; *City Railway* v. *Citizens R. R.,* 168 U. S. 557.

Section 14 finds no support in the doctrine underlying the application of the principle of police power. *Connolly* v. *Union Sewer Co.,* 124 U. S. 540; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Colon* v. *Lisk,* 153 N. Y. 188; *People* v. *Orange County Road Co.,* 175 N. Y. 84.

Section 14 is in conflict with the provisions of existing treaties, particularly the treaty with Italy, and therefore is a nullity. Constitution, Art. I, §§ 8, 9, 10; Art. II, § 2; Art. III, § 2; Art. VI, § 2; *McCulloch* v. *Maryland,* 4 Wheat. 316; *Gibbons* v. *Ogden,* 9 Wheat. 213; *United States* v. *Rauscher,* 119 U. S. 407; *Head Money Case,* 112 U. S. 580; *Charlton* v. *Kelly,* 229 U. S. 447; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Hauenstein* v. *Lynham,* 100 U. S. 483; *Ware* v. *Hylton,* 3 Dall. 199; *Chirac* v. *Chirac,* 2 Wheat. 259; *Geoffroy* v. *Riggs,* 133 U. S. 258; *Parrott's Case,* 1 Fed. Rep. 481; *Baker* v. *Portland,* 5 Sawyer, 566; *Livestock Association* v. *Crescent City Co.,* 1 Abb. (U. S.) 388; *Rutgers* v. *Waddington,* Mayor's Court of New York; *People* v. *Gerke,* 5 California, 431; *South Carolina* v. *United States,* 199 U. S. 437.

This court is not concluded by the decision of the Court of Appeals as to the rights of either the City or the subway contractors as the law applicable to such rights as pre-

sented in this record and the rules applicable are those of
general jurisprudence and not matters of local law. *Jefferson Bank* v. *Skelly*, 1 Black. 436; *Wright* v. *Nagle*, 101
U. S. 791; *Ill. Cent. R. R.* v. *Chicago*, 176 U. S. 646; *Butz*
v. *Muscatine*, 8 Wall. 575; *Olcott* v. *Supervisors*, 16 Wall.
678; *Boyce* v. *Tabb*, 18 Wall. 548; *Fallbrook District* v.
*Bradley*, 164 U. S. 112; *Tennessee* v. *Davis*, 100 U. S. 257;
*Pana* v. *Bowler*, 107 U. S. 529; *Union Lime Co.* v. *Chicago
&c. R. R.*, 233 U. S. 211.

The subway contracts in question are not the character
of public contracts referred to in the statute, and under
the authorities cited above this court may so determine,
as the legal question involved is not one of local law.

The covenant in the construction contracts to comply
with § 14 is not binding on the contractors, the law itself
being invalid. *Rodgers* v. *Coler*, 166 N. Y. 1; *North* v.
*Featherstonhaugh*, 172 N. Y. 112; *Knowles* v. *New York*,
176 N. Y. 430; *Insurance Co.* v. *Morse*, 20 Wall. 445.

*Mr. James F. McKenney*, for plaintiffs in error Cranford
Company and others, in No. 386, and for plaintiff in error
in No. 388, argued simultaneously herewith, submitted.

*Mr. George S. Coleman* for defendants in error in No. 386,
and *Mr. Robert S. Johnstone*, with whom *Mr. Charles Albert Perkins*, District Attorney of New York County, and
*Mr. George Z. Medale* were on the brief, for defendants in
error in No. 388 argued simultaneously herewith.

After stating the case as above, MR. JUSTICE McKENNA
delivered the opinion of the court.

There seems to have been no question raised as to the
right of Heim to maintain the suit, although he is not one
of the contractors nor a laborer of the excluded nationality
or citizenship. The Appellate Division felt that there
might be objection to the right, under the holding of a

cited case. The Court of Appeals, however, made no comment, and we must—certainly may—assume that Heim had a right of suit; and, so assuming, we pass to the merits.

The Supreme Court put its decision upon the power of the State "to provide what laborers shall be employed upon public works" and that "the State has the same right in conducting its business that an individual has" and had, therefore, "a perfect right to enact § 14 of the Labor Law, and it does not violate any rights of an alien under existing treaties."

The Appellate Division of the court, however, was of opinion that the law could not be sustained upon such consideration and saw in it such flagrant discrimination as to be offensive to the Fourteenth Amendment to the Constitution of the United States; and so concluding, the court considered it unnecessary to discuss the effect of treaties.

The court also passed, without absolute decision, the question whether the Labor Law applies to the work of building subways for the Rapid Transit in the City of New York. It was, however, stated in the opinion of the court that in view of the language in a cited case, there was "much ground for saying that even if the State could lawfully impose the test of citizenship upon employés of its own contractors, and the contractors with the city engaged in what is properly state work, it has no more power to impose such test upon the persons employed in building a subway for the city than it would have if the subway were being constructed by a private corporation or individual." Two members of the court were clear that the State had no such power and concurred besides with the majority in holding that the Labor Law was "a violation of both the Federal and state constitutions."

The Court of Appeals reversed the action of the Appellate Division.

The basic principle of the decision of the Court of Appeals was that the State is a recognized unit and those who are not citizens of it are not members of it. Thus recognized it is a body corporate and, "like any other body corporate, it may enter into contracts and hold and dispose of property. In doing this, it acts through agencies of government. These agencies, when contracting for the State, or expending the State's moneys, are trustees for the people of the State (*Illinois Central Railroad* v. *Illinois*, 146 U. S. 387). It is the people, i. e., the members of the State, who are contracting or expending their own moneys through agencies of their own creation." And it was hence decided that in the control of such agencies and the expenditure of such moneys it could prefer its own citizens to aliens without incurring the condemnation of the National or the state constitution. "The statute is nothing more," said Chief Judge Bartlett, concurring in the judgment of the court "in effect than a resolve by an employer as to the character of its employés."

Notwithstanding the simplicity of the determining principle pronounced by the Court of Appeals, its decision is attacked in many and voluminous briefs.

The fundamental proposition of plaintiff in error Heim is that, assuming that § 14 applies to the subway construction contracts in question, it (the law) contravenes the provisions of the Constitution of the United States (a) in that it violates the corporate rights of the city and the rights of its residents and taxpayers, (b) the rights of the various subway contractors with the city, (c) the rights of aliens and citizens of other States resident in New York, and (d) it is in violation of treaty rights.

Plaintiffs in error Cranford Company and Flinn-O'Rourke Company were made defendants upon their motion at the argument for injunction. In the Appellate Division they, their counsel say, "neither assenting to nor denying the special allegations, doubtless urged by com-

plainant's counsel, . . . urged the single ground of the unconstitutionality of the law and its violation of treaties." And these grounds are again urged.

To sustain the charge of unconstitutionality the Fourteenth Amendment is adduced, and the specification is that the law abridges the privileges and immunities of the contractors and those of their alien employés in depriving them of their right of contracting for labor, and that the State of New York, by enacting and enforcing the law, deprives employers and employés of liberty and property without due process of law and denies to both the equal protection of the law.

The treaty that it is urged to be violated is that with Italy, which, it is contended, "put aliens within the State of New York upon an equality with citizens of the State with respect to the right to labor upon public works;" and that Congress has fortified the treaty by § 1977 of the Revised Statutes,—(a part of the Civil Rights legislation).

The application of the law to the subway contracts, and whatever its effect and to what extent it affects the corporate rights of the city or of the subway contractors are local questions (*Stewart* v. *Kansas City, ante,* p. 14), and have in effect been decided adversely to plaintiffs in error by the Court of Appeals. The principle of its decision was, as we have seen, that the law expressed a condition to be observed in the construction of public works; and this necessarily involved the application of § 14 to subway construction and the subordinate relation in which the city stood to the State. Therefore, the contention of plaintiffs in error that the rapid transit lines have given the city rights superior to the control of the State, so far as the law in question is concerned, has met with adverse decision. Whatever of local law or considerations are involved in the decision we are bound by; whatever of dependence the decision has in the general power of a

State over its municipalities has support in many cases. We have recently decided the power exists, and we may be excused from further discussion of it. *Stewart* v. *Kansas City, supra.*

With the rejection of the asserted rights of the city must go the asserted rights of residents and taxpayers therein and the rights of subway contractors, so far as they depend upon the asserted freedom of the city from the control of the State.

The claim of a right in the city of such freedom is peculiar. The State created a scheme of rapid transit, constituted officers and invested them with powers to execute the scheme, yet, the contention is, that scheme, officers and powers have become in some way in their exercise and effect superior to the state law, or, according to the explicit contention (we say explicit contention, but it is rather a conclusion from an elaborate argument and much citation of cases), that the city's action in regard to the subway is proprietary in character, and, being such, the city can assert rights against the State, and that individual rights have accrued to residents of the city of which the city is the trustee and which "are so interwoven and bound up with the rapid transit system as to be 'beyond the control of the State.'" Counsel have not given us a sure test of when action by a city is governmental and when proprietary. We need not attempt a characterization. If it be granted that the city acted in the present case in a proprietary character and has secured proprietary rights, to what confusion are we brought! A taxpayer of the city, invoking the rights of the city, asserts against the control by the State of the proprietary action of the city the protection of the Fourteenth Amendment, and then against the proprietary action of the city that Amendment is urged in favor of the contractors with the city, and their exemption from the performance of their contracts declared. There seems to be a jumble of rights.

If the city is not an agent of the State (it is contended the city is not) but a private proprietor (it is contended the city is) it would seem as if it has the rights and powers of such a proprietor, and, as such, may make what contracts please it, including or excluding alien laborers.

But upon these suppositions we need not dwell. It is clear it is with the state law and the city's execution of it as agent of the State that we must deal and only on the assumption that the state law has been held to apply by the Court of Appeals, and, by a consideration of the power to enact it, determine the contentions of all of the plaintiffs in error.

The contentions of plaintiffs in error under the Constitution of the United States and the arguments advanced to support them were at one time formidable in discussion and decision. We can now answer them by authority. They were considered in *Atkin* v. *Kansas*, 191 U. S. 207, 222, 223. It was there declared, and it was the principle of decision, that "it belongs to the State, as guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities." And it was said, "No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern."

This was the principle declared and applied by the Court of Appeals in the decision of the present case. Does the instance of the case justify the application of the principle? In *Atkin* v. *Kansas* the law attacked and sustained prescribed the hours (8) which should constitute a day's work for those employed by or on behalf of the State, or by or on behalf of any of its subdivisions. The Fourteenth Amendment was asserted against the law; indeed, there is not a contention made in this case that was not made in that. Immunity of municipal corporations from legis-

lative interference in their property and private contracts was contended for there (as here); also that employés of contractors were not employés of cities. It was contended there (as here) that the capacity in which the city acted, whether public or private, was a question of general law not dependent upon local considerations or statutes, and that this court was not bound by the decision of the state court. And there (as here) was asserted a right to contest the law, though the contracts were made subsequent to and apparently subject to it, upon the ground that they were entered into under the belief that the law was void. Finally the ultimate contention there was (as it is here) that the liberty of contract assured by the Fourteenth Amendment was infringed by the law. In all particulars except one the case was the prototype of this. There the hours of labor were prescribed; here the kind of laborers to be employed. The one is as much of the essence of the right regulated as the other, that is, the same elements are in both cases—the right of the individual employer and employé to contract as they shall see fit, the relation of the State to the matter regulated, that is, the public character of the work.

The power of regulation was decided to exist whether a State undertook a public work itself or whether it "invested one of its governmental agencies with power to care" for the work, which, it was said, "whether done by the State directly or by one of its instrumentalities," was "of a public, not private, character." And, being of public character, it (the law—the Kansas statute) did not "infringe the liberty of any one." The declaration was emphasized. "It cannot be deemed," it was said, "a part of the liberty of any contractor that *he* be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the State." And obversely it was said (as we have already quoted): "On the contrary, it belongs to the State, as the guardian of its people, and

having control of its affairs, to prescribe the *conditions* [italics ours] upon which it will permit public work to be done on its behalf, or on behalf of its municipalities." See also *Ellis* v. *United States*, 206 U. S. 246. The contentions of plaintiffs in error, therefore, which are based on the Fourteenth Amendment cannot be sustained.

Are plaintiffs in error any better off under the treaty provision which they invoke in their bill? The treaty with Italy is the one especially applicable, for the aliens employed are subjects of the King of Italy. By that Treaty (1871) it is provided, Articles II and III, 17 Stat. 845, 846:

"The citizens of each of the high contracting parties shall have liberty to travel in the States and Territories of the other, to carry on trade, wholesale and retail, to hire and occupy houses and warehouses, to employ agents of their choice, and generally to do anything incident to, or necessary for trade, upon the same terms as the natives of the country, submitting themselves to the laws there established."

"The citizens of each of the high contracting parties shall receive, in the States and Territories of the other, the most constant protection and security for their persons and property, and shall enjoy in this respect the same rights and privileges as are or shall be granted to the natives, on their submitting themselves to the conditions imposed upon the natives."

There were slight modifications of these provisions in the treaty of 1913, as follows: "That the citizens of each of the high contracting parties shall receive, in the States and Territories of the other, the most constant security and protection for their persons and property and for their rights. . . ."

Construing the provision of 1871 the Court of Appeals decided that it "does not limit the power of the State, as a proprietor, to control the construction of its own works and the distribution of its own moneys." The conclusion

is inevitable, we think, from the principles we have, announced. We need not follow counsel in dissertation upon the treaty-making power. or the obligations of treaties when made. The present case is concerned with construction, not power; and we have precedents to guide construction. The treaty with Italy was considered in *Patsone* v. *Pennsylvania,* 232 U. S. 138, 145, and a convention with Switzerland (as in the present case) which was supposed to become a part of it. It was held that a law of Pennsylvania making it unlawful for unnaturalized foreign born residents to kill game, and to that end making the possession of shotguns and rifles unlawful, did not violate the treaty. Adopting the declaration of the court below, it was said "that the equality of rights that the treaty assures is equality only in respect of protection and security for persons and property." And the ruling was given point by a citation of the power of the State over its wild game which might be preserved for its own citizens. In other words, the ruling was given point by the special power of the State over the subject-matter, a power which exists in the case at bar, as we have seen.

From these premises we conclude that the Labor Law of New York and its threatened enforcement do not violate the Fourteenth Amendment or the rights of plaintiffs in error thereunder nor under the provisions of the treaty with Italy.

*Judgment affirmed.*