LUBETICH et al. v. POLLOCK, Supervisor of Fisheries, et al.

(District Court, W. D. Washington, S. D. June 13, 1925.)

No. 246E.

1. **Fish** ⊜➝8—State may deny aliens right to take fish within its borders.

A state owns the food fish in the waters over which it has jurisdiction, as the common property of its citizens, and aliens and nonresidents of the state may be constitutionally denied the right to take fish within its borders.

2. **Constitutional law** ⊜➝275(1), 276—Fish ⊜➝9—In prohibiting aliens from fishing, state is not invading constitutional rights.

A state, in prohibiting aliens from fishing in its waters, either for themselves or as employees of citizens, is not denying them their constitutional right to engage in a lawful occupation, or their employers the right to contract with whom they please, since it is dealing with its own property, as to which it may lawfully make regulations governing its own citizens as well as others.

3. **Treaties** ⊜➝14—State statute prohibiting commercial fishing by aliens held not in violation of treaty with Italy.

Laws Wash. 1923, p. 264, § 4, prohibiting aliens from engaging in commercial fishing in the waters of the state, either for themselves or as employees on fishing vessels of citizens, held constitutional and valid, and as applied to an Italian subject, not in violation of the Treaty of 1871 between the United States and Italy, as modified by the Treaty of 1913.

4. **Constitutional law** ⊜➝74— Regulations of state fisheries board not subject to review by courts.

The action of a state fisheries board in prescribing the kind of nets which may be used in certain waters of the state, if within the powers delegated to it, is a legislative matter, and not subject to judicial review, unless it manifestly cannot have any relation to the purpose in view.

5. **Courts** ⊜➝489(1)—Jurisdiction of particular state court exclusive.

The jurisdiction of the courts of a state, as to territory within the authority and control of the state, is a matter within the exclusive cognizance of the judicial tribunals of that state.

In Equity. Suit by Pete Lubetich and D. Hroncich against Charles R. Pollock, as supervisor of Fisheries, and others. On motions for preliminary injunction and to dismiss bill. Motion to dismiss granted.

Van C. Griffin, of Seattle, Wash., for complainants.

John H. Dunbar, Atty. Gen., E. W. Anderson, Asst. Atty. Gen., and John I. O'Phelan, Pros. Atty., of Raymond, Wash., for defendants.

Before GILBERT, Circuit Judge, and CUSHMAN and WEBSTER, District Judges.

WEBSTER, District Judge. The complaint in this action attacks the constitutionality of section 4, chapter 90, Laws 1923, of the state of Washington, which, as construed by state authorities, prohibits aliens from engaging in commercial fishing in the waters of this state, either in their individual capacity or as employees on fishing vessels owned and operated by citizens of the state. It further assails the constitutionality of certain orders and regulations promulgated by the state fisheries board, pursuant to the authority vested in it by the Legislature, effecting commercial fishing in that portion of the Columbia river and the Pacific Ocean over which the state of Washington has jurisdiction, and also in Grays and Willapa Harbors. The relief prayed is that the defendants be enjoined from enforcing the statute and regulations in question over the waters above mentioned as against the complainants Hroncich, a subject of the government of Italy, lawfully admitted into the United States, and Lubetich, a citizen of the United States and of the state of Washington, engaged in the business of operating a purse seine fishing boat, and in that capacity being the employer of Hroncich, a fisherman.

It is contended that the statute involved prohibiting an alien from being employed on a fishing vessel is a violation of section 12, article 1, of the Constitution of the state of Washington, and also of the Fourteenth Amendment to the Constitution of the United States. The claim is also made that the statute is in contravention of the provisions of the treaty between the United States and the kingdom of Italy. In addition it is asserted that certain orders and regulations of the Fisheries Board are unreasonable, arbitrary and capricious, and therefore in violation of the same constitutional provisions; and finally, that complainants, unless the injunctive relief prayed for be granted, will be arrested and prosecuted in the courts of Pacific County, which have no jurisdiction over offenses committed on the Pacific Ocean within the three-mile limit, thereby depriving them of due process of law. The case was argued to three judges, pursuant to section 266 of the Judicial Code (Comp. St. § 1243), and submitted on the motion of complainants for a temporary injunction and the motion of the defendants to dismiss the bill.

Section 4, chapter 90, Laws 1923, reads:

"It shall be unlawful for any person to fish or take for sale or profit any salmon or other food or shellfish in any of the rivers or waters of this state or over which it has concurrent jurisdiction in civil and criminal cases, unless such person prior to January 1, 1924, be a citizen of the United States or has declared his intention to become such and is and has been, for twelve months immediately prior to the time he engages in such business, a resident of this state or an adjoining state, and from and after January 1, 1924, unless such person be a citizen of the United States and is and has been for twelve months immediately prior to the time he engages in such business an actual resident of this state or an adjoining state; but this section shall not apply to Indians; and nothing in this act shall be construed to prohibit fishing or the taking of fish with a hook and line. The word 'fishing' as used in this act shall be deemed and construed to mean the catching or taking of food fish with any appliance, gear or trap, floating or fixed, whatsoever."

It cannot be doubted that the clause of the Fourteenth Amendment guaranteeing equal protection of the laws is of universal application to all persons within the territorial jurisdiction involved, and includes within its protection aliens, without regard to race, color, or nationality. The first question for decision, therefore, is: Does the statute under review amount to a denial of such equal protection? The whole question of the ownership of fish and game and the nature of the title thereto is exhaustively considered by the Supreme Court in the case of Geer v. Connecticut, 161 U. S. 519, 16 S. Ct. 600, 40 L. Ed. 793. In that case the court had under consideration a statute of Connecticut which made it unlawful to kill any woodcock, ruffled grouse, or quail for the purpose of conveying the same beyond the limits of the state. Both the civil and common law authorities were elaborately reviewed, and in the course of the opinion Mr. Justice White declared that from the earliest traditions the right to reduce animals feræ naturæ to possession has been subject to the control of the law giving power; that the wild game within a state belongs to the people in their collective sovereign capacity; that it is not the subject of private ownership except insofar as the people may choose to make it so, and they may, if they see fit, absolutely prohibit the taking of it or the traffic or commerce in it. The following excerpt from

the case of Magner v. People, 97 Ill. 320, was quoted with approval:

"The ownership being in the people of the state, the repository of the sovereign authority, and no individual having any property rights to be affected, it necessarily results that the Legislature, as the representative of the people of the state, may withhold or grant to individuals the right to hunt and kill game, or qualify or restrict, as in the opinion of its members will best subserve the public welfare. Stated in other language, to hunt and kill game is a boon or privilege, granted, either expressly or impliedly, by the sovereign authority—not a right inherent in each individual; and, consequently, nothing is taken away from the individual when he is denied the privilege, at stated seasons, of hunting and killing game. It is, perhaps, accurate to say that the ownership of the sovereign authority is in trust for all the people of the state, and hence by implication it is the duty of the Legislature to enact such laws as will best preserve the subject of the trust and secure its beneficial use in the future to the people of the state. But in any view, the question of individual enjoyment is one of public policy and not of private right."

The statute was upheld, and in the opinion this language is found:

"The sole consequence of the provision forbidding the transportation of game, killed within the state, beyond the state, is to confine the use of such game to those who own it, the people of that state. The proposition that the state may not forbid carrying it beyond her limits involves, therefore, the contention that a state can not allow its own people the enjoyment of the benefits of the property belonging to them in common, without at the same time permitting the citizens of other states to participate in that which they do not own."

In the more recent case of Lacoste v. Department of Conservation, 263 U. S. 545, 44 S. Ct. 186, 68 L. Ed. 437, it is said:

"The wild animals within its borders are, so far as capable of ownership, owned by the state in its sovereign capacity for the common benefit of all of its people. Because of such ownership, and in the exercise of its police power the state may regulate and control the taking, subsequent use, and property rights that may be acquired therein."

In McCready v. Virginia, 94 U. S. 391, 24 L. Ed. 248, there was involved a statute of the state of Virginia which prohibited any person not a citizen of that state from taking oysters or shellfish in certain tide waters.

In sustaining the statute against the charge that it violated the Fourteenth Amendment, the court, Mr. Chief Justice Waite writing, said:

"The principle has long been settled in this court that each state owns the beds of all tidewaters within its jurisdiction, unless they have been granted away. ⁂ ⁂ ⁂ In like manner, the states own the tide waters themselves, and the fish in them, so far as they are capable of ownership while running. For this purpose the State represents its people, and the ownership is that of the people in their united sovereignty. ⁂ ⁂ ⁂ The title thus held is subject to the paramount right of navigation, the regulation of which, in respect to foreign and interstate commerce, has been granted to the United States. There has been, however, no such grant of power over the fisheries. These remain under the exclusive control of the state, which has consequently the right, in its discretion, to appropriate its tidewaters and their beds to be used by its people as a common for taking and cultivating fish, so far as it may be done without obstructing navigation. Such an appropriation is, in effect, nothing more than a regulation of the use by the people of their common property. The right which the people of the state thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship."

Later on in the opinion this language is used:

"And as all concede that a State may grant to one of its citizens the exclusive use of a part of the common property, the conclusion would seem to follow, that it might by appropriate legislation confine the use of the whole to its own people alone."

Patsone v. Pennsylvania, 232 U. S. 138, 34 S. Ct. 281, 58 L. Ed. 539, dealt with a statute of Pennsylvania which made it unlawful for any unnaturalized, foreign-born resident to kill any wild bird or animal, except in defense of person or property, and to that end made it unlawful for such foreign-born person to own or be possessed of a shotgun or rifle. The constitutionality of the statute was challenged as being a violation of the Fourteenth Amendment. In upholding the law the court said: "It is to be remembered that the subject of this whole discussion is wild game, which the State may preserve for its own citizens if it pleases. Geer v. Connecticut, 161 U. S. 519, 529."

In the case of McMillan v. Sims (Wash.) 231 P. 943, recently decided by the Supreme

Court of this state, this language is employed: "Let us at the outset be reminded that in the regulation of and restrictions upon the taking of the fish from the waters of the state, the state is but dealing with its own property over which its control is as absolute as any other owner has over his property. In State v. Tice, 69 Wash. 403, 125 P. 168, 41 L. R. A. (N. S.) 469, we said: 'The decisions of the courts in this country, so far as they have come to our notice, are all in unison in holding that there is no private right in the citizen to take fish or game, except as such right is either expressly or inferentially given by the state.' "

[1] In the light of the foregoing authorities it seems unescapable that the state owns the food fish in the waters over which it has jurisdiction, the same as any other proprietor owns property, and that aliens and nonresidents of the state may be constitutionally denied the right to take fish within its borders. The power to make such disposition of the fish arises out of and is incidental to the ownership of the property.

[2] Is the statute in question open to the charge that it denies Hroncich the right to engage in a lawful occupation, trade, or business, and denies Lubetich the right to contract with whomsoever he pleases, and hence is in conflict with the Fourteenth Amendment? The cases of Heim v. McCall, 239 U. S. 175, 36 S. Ct. 78, 60 L. Ed. 206, Ann. Cas. 1917B, 287, and Crane v. New York, 239 U. S. 195, 36 S. Ct. 85, 60 L. Ed. 218, deal with the constitutionality of statutes forbidding contractors on public works from employing aliens. These statutes were held not to be in violation of the Fourteenth Amendment. In the matter of developing their public works, municipalities are dealing with their own property, and in consequence may prescribe such conditions as they see fit. "The principle that justifies these discriminations is that the common property of the state belongs to the people of the state, and hence that, in any distribution of that property, 'the citizen may be preferred." People v. Crane, 214 N. Y. 154, 108 N. E. 427. See, also, Atkin v. Kansas, 191 U. S. 207, 24 S. Ct. 124, 48 L. Ed. 148.

Obviously it is a denial of the equal protection of the laws when a lawmaking body, regulating, not its own property, but private business, undertakes to deny to aliens the right to engage in lawful trade or labor; but it is difficult to comprehend how there can be any such violation when the Government, in its capacity of owner and proprietor of property, refuses to allow an alien the right to share therein on equal terms with those for whom the property involved is held in sovereign trust. In such circumstances aliens are denied participation in the property, for the simple reason that they do not own it, either in whole or in part, and in consequence have no right to share its enjoyment. We are not considering a case involving the proper exercise of police power, but a case wherein the state of Washington is making disposition of its own property. The case of Alsos v. Kendall, 227 P. 286, recently considered by the Supreme Court of Oregon, is "on all fours" with the case in hand. In that case it was held:

"The rights of the state in the fish and in the waters from which the fish are to be taken are superior to plaintiff's right to choose fishing for salmon in those waters for an occupation. Such an occupation is not open to an alien against the legislative will of the state, since it involves the appropriation of property belonging to the state in its sovereign capacity. The state, in prohibiting aliens from engaging in the taking of salmon fish, is dealing with the common property of the people of the state; in prohibiting citizens of other states and unnaturalized foreign-born residents from fishing in the public waters of the state the state is, in fact, dealing with a property right of the state, and not with a mere privilege or immunity of a citizen of another state, nor does it amount to a denial to an alien within the state of the equal protection of its laws. Under the police power of the state the Legislature may prescribe any terms or conditions reasonably necessary for the preservation of the fish, but in the enactment of this law the Legislature was not legislating under its police powers, but under its reserved powers as the owner of the property which was the subject of the legislation, and which was to be affected thereby. As such owner it was authorized to prescribe any terms or conditions upon which the property of the state might be converted into private ownership. In legislating to that end it was dealing with its own property, and it had all of the rights and powers of an individual owner subject only to the duties which it owed to its own citizens."

The court concluded that the fact that the Oregon statute prohibited the plaintiff from accepting employment from one lawfully engaged in fishing, and thereby prevented him from earning a livelihood in that particular occupation, did not in the circumstances render the statute unconstitutional. The reasoning of this case commends itself to our judg-

ment as altogether sound. See, also, Curry v. Moran, 76 Fla. 373, 79 So. 637. Haavik v. Alaska Packers' Association, 263 U. S. 510, 44 S. Ct. 177, 68 L. Ed. 414.

We conclude that the statute under review is not unconstitutional, as violative of the Fourteenth Amendment, so far as Hroncich, the subject of Italy, is concerned; and if he is lawfully denied the right to engage in fishing, palpably Lubetich is not deprived of any constitutional protection by being denied the right to enter into a contract for the performance of labor which would be in violation of the laws of Washington. Let it not be forgotten that the right of Lubetich, a citizen of Washington, to take fish from the waters of that state, is subject to the conditions imposed by the state Legislature, and his freedom of contract cannot be asserted to the point where it infringes upon the right of the state to deal with its own property.

[3] Does the statute violate the provisions of the treaty with Italy? The language of the treaty of 1871 upon which reliance is placed by Hroncich, the alien complainant, provides: "The citizens of each of the high contracting parties shall have liberty to travel in the states and territories of the other, to carry on trade, wholesale and retail, to hire and occupy houses and warehouses, to employ agents of their choice, and generally to do anything incident to or necessary for trade, upon the same terms as the natives of the country, submitting themselves to the laws there established. The citizens of each of the high contracting parties shall receive, in the states and territories of the other, the most constant protection and security for their persons and property, and shall enjoy in this respect the same rights and privileges as are or shall be granted to the natives, on their submitting themselves to the conditions imposed upon the natives." 17 Stat. 846.

There were modifications of these provisions in the Treaty of 1913, as follows: "It is agreed between the high contracting parties that the first paragraph of article III of the Treaty of Commerce and Navigation of February 26, 1871, between the United States and Italy, shall be replaced by the following provision: The citizens of each of the high contracting parties shall receive in the states and territories of the other the most constant security and protection for their persons and property and for their rights, including that form of protection granted by any state or national law which establishes a civil responsibility for injuries or for death caused by negligence or fault and gives to relatives or heirs of the injured party a right

6 F.(2d)—16

of action, which right shall not be restricted on account of the nationality of said relatives or heirs; and shall enjoy in this respect the same rights and privileges as are or shall be granted to nationals, provided that they submit themselves to the conditions imposed on the latter." 38 Stat. 1670.

The Supreme Court, in Patsone v. Pennsylvania, supra, held that the action of the Legislature of the state of Pennsylvania prohibiting the killing of game by aliens did not violate this treaty. After saying that the whole discussion had to do with wild game, Mr. Justice Holmes said: "We see nothing in the treaty that purports or attempts to cut off the exercise of their powers over the matter by the states to the full extent."

This treaty was again invoked in Heim v. McCall, supra, but again the contention based upon it was rejected, the court saying: "Construing the provision of 1871 the Circuit Court of Appeals decided that it 'does not limit the power of the state, as a proprietor, to control the construction of its own works and the distribution of its own moneys.' The conclusion is inevitable, we think, from the principles we have announced. We need not follow counsel in dissertation upon the treaty making power or the obligations of treaties when made. The present case is concerned with construction, not power; and we have precedents to guide construction. The treaty with Italy was considered in Patsone v. Pennsylvania, 232 U. S. 138, 145, and a convention with Switzerland (as in the present case) which was supposed to become a part of it. It was held that a law of Pennsylvania making it unlawful for unnaturalized foreign-born residents to kill game, and to that end making the possession of shotguns and rifles unlawful, did not violate the treaty. Adopting the declaration of the court below, it was said 'that the equality of rights that the treaty assures is equality only in respect of protection and security for persons and property.' And the ruling was given point by a citation of the power of the state over its wild game which might be preserved for its own citizens. In other words, the ruling was given point by the special power of the state over the subject-matter, a power which exists in the case at bar, as we have seen." See, also, People v. Crane, supra. Leong Mow v. Board of Commrs. (C. C.) 185 F. 223.

The foregoing authorities seem conclusive of the treaty question presented and resolve the point adversely to the contention of complainant Hroncich.

[4] The regulations of the fisheries board which are under attack are too lengthy to be set forth in full. It will perhaps be sufficient to say that the unreasonableness and arbitrariness complained of consist in the prohibiting of the taking of fish from the Pacific Ocean and rivers and harbors adjacent thereto by means of a purse seine, while permitting fish to be taken therefrom with set nets, pound nets, gill nets, and drag seines; it being alleged in the complaint that purse seines are the least destructive of any of the recognized types of net fishing gear. It seems too plain to justify lengthy discussion that this contention presents a legislative, not a judicial, question. It was so ruled by this court in Katick v. Dibble, No. 154E of the files of this court, a case heard before Judges Gilbert, Cushman, and Neterer (no written opinion). The bill in that case presented precisely the same question now urged upon us. The court refused to hear evidence tending to impeach the regulations of the fisheries board and dismissed the bill upon the ground that the matter was one of legislative policy; the board having acted within the scope of its delegated powers. It is well sustained in the authorities that the legislative determination of such questions is conclusive upon the courts, unless it manifestly appears that the regulations imposed cannot have any relation to the accomplishment of the purpose in view. Jacobson v. Mass., 197 U. S. 11, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765; Powell v. Pennsylvania, 127 U. S. 678, 8 S. Ct. 992, 32 L. Ed. 253; Louisville & Nashville R. R. Co. v. Garrett, 231 U. S. 298, 34 S. Ct. 48, 58 L. Ed. 229. McMillan v. Sims, supra.

In the case last cited, the Supreme Court of this state said: "By what agency may the state act and speak in the making of such regulations and restrictions as it desires to put into force with reference to the taking of fish from its waters? Of course, it may do so through direct action of its Legislature directly and specifically prescribing rules and territorial limits within which fish may and may not be taken. It is elementary law that, when such regulations and restrictions are directly so prescribed by the Legislature, the courts have no concern with the reasonableness and wisdom of such regulations and restrictions; and, since the Legislature may delegate to some other state agency, in this case to the state fisheries board, the determination of territorial limits within which fish may or may not be taken (Cawsey v. Brickey, supra), we think the action of such agency, within the scope of its legislative prescribed power, is equally beyond judicial control or interference. This, it seems to us, must be true, especially in view of the fact that the state is thereby but creating and empowering an agency for the disposition of its own property."

[5] With respect to the jurisdiction of the superior court of the state of Washington for Pacific county, it is alleged that the western boundary of the state of Washington is one marine league west of the seacoast, while the western boundary of Pacific county is at the seacoast. Hence, it is insisted, there is a strip of water three miles in width and extending the length of Pacific county which is within the state of Washington, but not within Pacific county, or any other county of the state. In consequence of this situation it is asserted that the courts of Pacific county have no jurisdiction over this three-mile strip. Palpably this contention presents no federal question within the competency of this court to determine. The jurisdiction of the courts of Washington as to territory within the authority and control of the state of Washington is a matter within the exclusive cognizance of the judicial tribunals of that state.

A number of situations are suggested in the brief of counsel for complainants, and were referred to in oral argument, raising questions concerning the constitutionality of section 4 under certain supposed conditions; but, since neither of the complainants comes within any of the hypothetical categories assumed, they cannot be heard to make the questions, and this court is without power to consider them in this case.

From the foregoing views, it follows that the bill must be dismissed.

Decree accordingly.