The plaintiff alleged that it had been duly incorporated under the laws of the State of Delaware and was a common carrier of express and a public utility company "engaged in the business of carrying to, from, or throughout North Carolina, . . . money, packages, gold, silver, plate, or other articles and commodities by express," and thus is within the definition of an "Express Company," as contained in paragraph 13 of section 502 of the Revenue Act of North Carolina of 1929. Said plaintiff began operation in North Carolina on 1 March, 1929. Prior to that time the business which it now conducts had been done by the American Railway Express Company under contracts between that *Page 639 
company and the railroads, which contracts expired on 28 February, 1929, and were not renewed. Prior to its succession to this business the Railway Express Agency purchased from the American Railway Express Company all of its property, including real estate used by the latter in the conduct of its express transportation business. This property was purchased for $30,488,114.62, which represented its true value. As against these assets the Railway Express Agency issued its bonds bearing 5 per cent interest in the amount of $32,000,000, which said bonds are now outstanding. Out of the net proceeds from the sale of the bonds the Railway Express Agency paid the American Railway Express Company the agreed purchase price of the property bought from it, retaining the balance for organization expenses and working capital. The capital stock of the Railway Express Agency consists of 1,000 shares of common stock of no nominal or par value, but which were sold at $100 per share. This sum, plus the amount realized from the sale of the bonds, constitutes the invested capital of the company.
On 1 March, 1929, the plaintiff made a contract with approximately six hundred and fifty railroad lines throughout the country, as set forth in the record. This contract so far as pertinent to the decision of the case, provided in substance that the plaintiff was to carry on such express transportation business over such lines named in the contract as was formerly carried on by the American Railway Express Company under a contract effective 1 March, 1923. The various railway companies signing the contract constituted and appointed the plaintiff as its exclusive agent for the conduct and transaction of the express transportation business upon such passenger express or mail lines of such railway company as may be agreed to. Each railway company further agreed that it would not for compensation transport valuables, money, goods or property of any description independently of the provisions of the contracts with certain exceptions therein specified. The revenue arising from the operation was to be apportioned according to the method set up in the agreement and "the balance remaining shall be designated as `Rail Transportation Revenue,' and shall be distributed among the carriers in the group executing this form of agreement, including the Rail Company party to this agreement, in the proportion that the gross express transportation revenues on other than carload business for the month earned on the line of each such carrier bears to the gross express transportation revenues on other than carload business earned on the line of all such carriers in that group for that month." The plaintiff offered evidence tending to show that it operated in every State in the Union, and in Canada and Mexico, and that the total railroad mileage in the United States over which the plaintiff operated 1 July, 1929, was 223,629 miles, and the total railroad mileage *Page 640 
operated by the plaintiff in the State of North Carolina on said date was 3,053 miles. "From 1 March, 1929, to and including 30 June, 1929, the plaintiff transported solely in intrastate traffic in the State of North Carolina 111,192 shipments, for which the plaintiff received revenue amounting to $122,286.69. During the same period the plaintiff received at points in the State of North Carolina interstate traffic forwarded from points without the State of North Carolina, 472,842 shipments, for which the plaintiff received revenue amounting to $762,853. 98. During the year 1929, the total number of intrastate shipments handled over the entire system was 49,782,955, for which revenue amounting to $52,136,859.78 was received. The ratio of the intrastate revenue to interstate revenue wherever the company operated during the year 1929 was 18.28 per cent. The ratio of such revenue for the State of North Carolina for the same period was 16.05 per cent. The value of plaintiff's entire tangible property consisting of real estate, buildings, automobiles, trucks, and other equipment and supplies, is $30,183,482.94. The value of that part of such property, which is located in the State of North Carolina, is $136,488.33. The value of the company's real estate, all of which is located outside of the State of North Carolina, is $13,991,450.76. During the four months period of operation in question, the revenue received by the plaintiff over its entire system was $99,138,771.49, of which amount, $122,286.69 only was received from operations wholly within the State of North Carolina. Of the total revenues received from express transportation the sum of $198,593.56 represents charges to the United States Government for shipments transported during the four months period. During this period the plaintiff owned United States Government bonds to the value of $1,090,187.75, on which was received interest amounting to $14,508.72. Interest amounting to $176,455.13 was also received on bank balances located without the State."
The evidence further tended to show that the American Railway Express Company, which preceded the Railway Express Agency, and had been in operation since 1 July, 1918, made a profit upon its operations and paid dividends of slightly over 6 per cent upon its capital stock, and that "in business activities and progress, North Carolina was an average State of those through which the plaintiff operates."
The evidence further tended to show that in making comparison between the revenues of the company in intrastate commerce based on intrastate shipments on the one part and interstate shipments received at points in North Carolina from points without the State on the other part, no consideration was given to revenues arising from interstate shipments from points in North Carolina designated to points without that State. *Page 641 
The plaintiff was domesticated in North Carolina 23 January, 1929, and on 28 August, 1929, made a report to the defendant, Commissioner of Revenue for North Carolina, required by section 205 of Public Laws of 1929, chapter 345. Pursuant to the provisions of said Revenue Act the defendant, Commissioner of Revenue, demanded a franchise tax in the sum of $45,795.65. The plaintiff paid said sum under protest, and thereafter in due time made a written demand for a refund of said tax and the interest. The defendant, Commissioner of Revenue, refused to refund said tax and interest, whereupon this action was instituted for the recovery thereof. A jury trial was waived, and it was agreed that the trial judge should pass upon all matters of fact and law involved in the action. After a hearing, the trial judge decreed that the statute complained of, was valid and constitutional, and that plaintiff was not entitled to recover the tax, from which judgment plaintiff appealed.
The Commissioner of Revenue for the State of North Carolina found that the plaintiff operates as an express company over 3,053.31 miles of railroad within said State. Thereupon, pursuant to section 205, chapter 345 of Public Laws of 1929, he demanded the sum of $15 per mile as a franchise or license tax, aggregating $45,799.65. The plaintiff paid the tax demanded, and after complying with the proper preliminaries provided by law, brought this action to recover the sum so paid.
The pertinent portion of the statute under which the tax was levied reads as follows: "Where the net income on the average capital invested during the year ending the thirtieth day of June of the current year is six per cent or less, $15.00 per mile of railroad lines. More than six per cent and less than eight per cent, $18.00 per mile of railroad lines. Eight per cent and over, $21.00 per mile of railroad lines operated over."
At the outset the plaintiff attacks the constitutionality of the statute generally, and also upon certain specific grounds, to wit:
(a) That said statute invades the domain of the commerce clause of the Federal Constitution in that an illegal burden is directly laid upon interstate commerce.
(b) That said statute imposes a tax upon business which the plaintiff does for the United States Government. *Page 642 
(c) That said statute undertakes to levy a tax upon property located outside the State of North Carolina and in other jurisdictions, contrary to section 1 of the Fourteenth Amendment of the Constitution of the United States.
(d) That said statute imposes a tax which is so excessive and burdensome as to amount to a confiscation of property.
Article V, section 3, of the Constitution of North Carolina, provides that "the General Assembly may also tax trades, professions, franchises and incomes," etc. Hence, the General Assembly has the power to levy a franchise tax, and in pursuance of such power, has through a course of years imposed such taxes upon express companies doing business within the State. Moreover, the tax has always been assessed upon a mileage basis. Beginning in 1913 with a tax of $3.00 per mile the General Assembly, in substantially similar statutes, increased the tax to $5.00 in 1921, $7.50 in 1925, and to a minimum of $15.00 per mile in 1929.
In arriving at a correct and sound conclusion as to whether the taxing statute of a sovereign State enacted in accordance with the constitution thereof invades the inhibitions of the supreme law of the land, it must be borne in mind that every reasonable presumption rises and runs in favor of validity. Mr. Justice Day, in Green v. Frazier, 253 U.S. 233, clothed the idea in these words: "The taxing power of the States is primarily vested in the legislatures, deriving their authority from the people. When a state legislature acts within the scope of its authority it is responsible to the people, and their right to change the agents to whom they have entrusted the power is ordinarily deemed a sufficient check upon its abuse. When the constituted authority of the State undertakes to exert the taxing power, and the question of the validity of its action is brought before this Court, every presumption in its favor is indulged, and only clear and demonstrated usurpation of power will authorize judicial interference with legislative action." Furthermore, "the burden is on him who seeks the recovery of a tax already paid to establish those facts which show its invalidity." Compania General v. Collector, 279 U.S. 306. See, also, Foxv. Haarstick, 156 U.S. 674; Heim v. McCall, 239 U.S. 175.
All courts are agreed that the franchise of a foreign corporation or its right to carry on its business in a particular State under the protection of the laws of such State is a proper subject for taxation, irrespective of the fact that a portion of the property included in the computation is used in interstate commerce. Mr. Justice Stone, writing the opinion inInternational Shoe Co. v. Shartel, 279 U.S. 429, said: "A franchise tax imposed on a corporation, foreign or domestic, for the privilege of doing a local business, if apportioned to business done or property owned within the State, is not invalid under the commerce *Page 643 
clause merely because a part of the property or capital included in computing the tax is used by it in interstate commerce." The signboards marking out the road along which a valid privilege tax must travel, are pointed out by Mr. Justice Brandeis in Sprout v. City of South Bend,277 U.S. 163. It is there written: "But in order that the fee or tax shall be valid, it must appear that it is imposed solely on account of the intrastate business; that the amount exacted is not increased because of the interstate business done; that one engaged in exclusively interstate commerce would not be subject to the imposition; and that the person taxed could discontinue the intrastate business without withdrawing also from the interstate business." N. Y. State v. Latrobe, 279 U.S. 421; MacAllen v.Mass, 279 U.S. 620; N. J. Telegraph Co. v. Tax Board, 280 U.S. 338;Western Cartridge Co. v. Emerson, 50 Supreme Court Reporter, 283. While the principles underlying privilege and franchise taxes have been discussed in the cases above cited and numerous others referred to therein, the chief difficulty encountered in arriving at the ultimate conclusion is the correct application of correct taxing theory to particular statutes and to particular states of fact.
The statute under attack in the case at bar imposes a minimum tax of "$15.00 per mile on railroad line" when the "net income on the average capital invested . . . is 6 per cent or less." Manifestly this language means that if an express company made nothing at all, it would be required to pay the minimum tax of $15.00 per rail mile. Hence, so far as this particular record is concerned, the terms "net income" and "average capital invested" are not involved in the specific question of law presented. If, under the taxing statute, the defendant, Commissioner of Revenue, had undertaken to levy a tax of $18.00 per rail mile, which levy would necessarily involve the determination of "net income" on "invested capital," then the plaintiff would be in a position to present squarely the legal questions debated in the brief. That is to say, section 205, chapter 345, Public Laws of 1929, imposes a franchise and privilege tax of $15.00 per mile on express companies licensed to do business in this State. Said tax is the minimum tax under any and all circumstances, and, as the record is interpreted the question as to what would happen or what the legal status of the parties would be if a higher tax had been levied under the statute, is at most an interesting but at the same time hypothetical question. Appellate Courts everywhere have been slow to plunge into the field of hypothesis and speculation in deciding constitutional questions, and have ordinarily been content to rest in safety upon the wisdom of the scriptural declaration: "Sufficient unto the day is the evil thereof." This is particularly true when the apprehended evil is constitutional in its nature. *Page 644 
It is obvious that if the interpretation given the statute is sound, the tax does not rise as interstate business increases or fall with the diminution thereof. Nor is there evidence tending to show that it is not imposed solely on account of intrastate business transacted; neither is there anything in the record tending to show that the plaintiff would not have the right at any time to discontinue intrastate business within North Carolina. Under the facts as disclosed upon the face of the record the tax is constant and points without variation to "$15.00 per rail mile."
Therefore, as we see it, the only question presented is whether the tax of $15.00 per rail mile is so excessive and exorbitant upon its face as to amount to a confiscation of property.
Under the tax structure set up in chapter 345 of the Revenue Act of 1929 domestic and foreign corporations are required to pay franchise or privilege taxes based upon certain data contained in reports filed with the Commissioner of Revenue. See sections 210 and 211 of said chapter 345. In addition, such corporations pay the license taxes imposed by various sections of said Revenue Act. However, express companies are exempt from the operation of sections 210 and 211 by section 213, and the tax assessed against them is by virtue of section 205. It is apparent, therefore, from an inspection of the statute that the tax imposed upon the plaintiff is a combination franchise and occupation tax assessed by the State, and counties are expressly prohibited from levying a privilege or license tax, and the amount leviable by municipalities is limited to a sliding scale of small proportions. The power granted to municipalities to impose the tax is doubtless based upon the fact that the plaintiff must necessarily use the streets in the orderly prosecution of its business. The evidence discloses that the revenue produced from exclusively intrastate business was $122,286.69 for a period of four months. Hence the annual revenue from such source would be approximately $366,860.07. The revenue arising from interstate shipments received by plaintiff within North Carolina was $762,853.98 for a period of four months. Hence the annual revenue from such source would be approximately $2,288,561.94. It also appears from the evidence that the plaintiff in constructing the comparison between revenue derived from intrastate commerce "based on intrastate shipments on the one part, and interstate shipments received at points in North Carolina from points without the State on the other part" that no consideration was given to interstate shipments from points in North Carolina to points without the State. So that the volume of such business does not appear. It does appear, however, that "in business activities and progress North Carolina is regarded as an average State of those through which the plaintiff operates." Furthermore, it does appear *Page 645 
that the "ratio of intrastate revenue to interstate revenue wherever the company operated during the year 1929 was 18.28 per cent. The ratio of such revenue for the State of North Carolina for the same period was 16.05 per cent.
The bald result is that the combined franchise and privilege tax imposed upon the plaintiff is slightly in excess of 12 per cent of its gross revenue derived exclusively from intrastate business, taking no account of other items and factors, which are worthy of consideration upon the contention that the amount is confiscatory.
There are other questions debated in the briefs with much learning and skill, but if the view of the law herein adopted by the Court is correct, all such questions become immaterial.
In conclusion, under the facts and circumstances presented or disclosed by this particular record and involved in a decision of this particular case, we cannot say that as a matter of law the tax imposed is confiscatory, and the judgment of the trial court is
Affirmed.