412 F.Supp. 1164 (1976)
C.D.R. ENTERPRISES, LTD., et al., Plaintiffs,
v.
The BOARD OF EDUCATION OF the CITY OF NEW YORK, Defendant.
ULYSEUS C. PAINTING & G. C. CORP. et al., Plaintiffs,
v.
Bernard J. LAKRITZ as Director of the Bureau of Maintenance and Operation of the Division of School Buildings of the Board of Education of the City of New York, et al., Defendants.
Nos. 75 C 1172, 75 C 1411.
United States District Court, E. D. New York.
March 24, 1976.
*1165 Morris Weissberg, New York City, Setiri Spiro Sotiriou, Long Island City, N. Y., for plaintiffs.
W. Bernard Richland, Corp. Counsel of New York City, by Thos. C. Greble, Asst. Corp. Counsel, for New York City defendants; Louis J. Lefkowitz, Atty. Gen. of the State of N. Y., by Judith Gordon, Asst. Atty. Gen., New York City, pro se in No. 75 C 1172 and for defendants Carey Lefkowitz and Levine in No. 75 C 1411.
Before GURFEIN, Circuit Judge, and NEAHER and PLATT, District Judges.
GURFEIN, Circuit Judge:
These two actions involve challenges to the constitutionality of Section 222 of the *1166 New York Labor Law, which provides that in the construction of public works, preference in employment must be given to citizens of the State of New York who have resided in New York for at least twelve months.
Until August 9, 1975, § 222 provided that in the construction of public works by the state or a public entity, preference in employment was to be given to citizens of the State of New York who have been residents for at least six months, and that persons other than citizens of the State of New York may be employed when such citizens are not available.[1]
Section 222 was amended by Chapter 848 of the Laws of 1975, effective August 9, 1975. The amended statute provides that preference in employment must be given to citizens of the State of New York who have been residents of the state for at least twelve consecutive months. It further provides that whenever the unemployment rate in a statistical metropolitan sampling area (SMSA) in New York State is determined by the federal Labor Board Bureau of Labor Statistics to be six per cent or more for a period of three consecutive months, preference in that SMSA shall be given first to the qualified citizens of the state who have been residents of such SMSA for twelve consecutive months, the preference to continue until the unemployment rate for such SMSA shall be below six per cent for three consecutive months. It also provides that persons other than citizens of the State of New York or residents of SMSA may be employed when such citizens or residents are not available.[2]
*1167 In the first case, plaintiff C.D.R. Enterprises, Ltd. ("C.D.R.") is a painting contractor, the primary source of whose business is painting contracts awarded to it by New York governmental agencies. Plaintiff Felix T. Gloro is the president of C.D.R., and plaintiff Charles D'Aleo is its secretary. Plaintiff Daniel Olivo is a legal resident alien, who has resided in New York County for over a year. He is employed by C.D.R. as a painter, and alleges that he wishes to do work on New York governmental contracts, but has not been assigned any such work by C.D.R. because of its concern over the possible application of § 222.
The parties have stipulated that C.D.R. was awarded an $85,000 contract by defendant Board of Education of the City of New York ("Board") to paint Public School No. 61, located in the Bronx. This contract provided that the contractor must strictly comply with all applicable provisions of the New York Labor Law, and that the Board may declare the contractor to be in default if it has violated any provision of the contract.
In April 1975, C.D.R. hired Laudalino Rosabal ("Rosabal"), a registered resident alien, as a painter, and assigned him to paint at Public School No. 61, where he worked for several weeks. Thereafter, C.D.R. was given written notice by the defendant to appear before its Board of Review on a charge of default of contract. When C.D.R. appeared, the Board of Review submitted papers which indicated that Rosabal was an alien. The Board further stated that Rosabal's employment was in violation of § 222. Plaintiffs allege that the Board intends to make a determination that C.D.R. committed a default of contract by employing Rosabal, and that the Board intends to cancel C.D.R.'s contract and to disqualify C.D.R. and its principals from all future bidding on contracts with the Board, by reason of this default.
In the second case, the plaintiffs, Ulyseus C. Painting & G. C. Corp. ("Ulyseus"), Laconia Painting Corp., Stratos Contracting Corp., Astoria Painting Co., Inc. and Hellas Contracting Corp., are painting contractors whose principal source of business is contracts to paint school buildings for the Board. It has been stipulated that plaintiff Ulyseus assigned Dimitrios Papadimitiriou, Andreas Andreoulakis, Dimitrios Firinlos, Alex Kapayiandes and Timotheos Vlachos, who are permanent resident aliens lawfully *1168 admitted to the United States, to work on contracts it had with the Board. All of these aliens have resided in New York County for over a year, except for Vlachos, who resides in Nassau County, which is outside the New York City Area SMSA.[3] The other plaintiffs in this action also employ aliens to do painting for the Board.
Plaintiffs allege that defendant John T. Carroll, Director of Construction of the City of New York, on June 23, 1975, sent a memorandum to all construction agencies directing that § 222 of the New York Labor Law be strictly enforced since the employment of aliens constitutes an economic detriment to citizens of New York. They further allege that the defendant Bernard J. Lakritz, Director of the Bureau of Maintenance and Operation of the Division of School Buildings of the Board of Education of the City of New York, sent a letter to each of the plaintiffs on July 14, 1975, threatening that contractors who employ alien labor will have their contracts declared void and will not be eligible for award of future Board contracts. It is further alleged that on August 18, 1975, the defendant William Gleeson ("Gleeson"), a civil engineer employed in the Office of Maintenance and Operation of the Division of School Buildings of the Board of Education, told the attorney for the plaintiffs that he would cancel all contracts of employers who employed aliens, and that on the next day Gleeson appeared at a job site where one of the plaintiffs was engaged in performing a contract for the Board of Education and told its president to stop work because it was allegedly violating § 222.
Plaintiffs in both actions contend that Section 222 of the Labor Law is unconstitutional in that it violates the equal protection and due process clauses of the Fourteenth Amendment. The plaintiffs in the second action also contend that § 222 interferes with a comprehensive scheme enacted by Congress in the exercise of its exclusive power over immigration, that it violates the Supremacy Clause, the right to travel, and the privileges and immunities clauses of Article IV and of the Fourteenth Amendment, and that it is unconstitutionally vague.
Plaintiffs requested that a three-judge court be convened, that Section 222 of the New York Labor Law be declared unconstitutional, and that the defendants be enjoined from cancelling the plaintiffs' contracts and from taking any action to enforce the statute or any rules and regulations promulgated thereunder. Jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1343.

I
The lawfully admitted resident alien who is denied employment because a citizen is preferred is almost as much the object of discrimination as the resident alien who is denied the right to employment at all. He has been classified as a person who need not receive the equal protection of the laws because of his status. Yet a resident alien is surely a "person" within the meaning of the due process and equal protection clauses. Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220, 226 (1886); Truax v. Raich, 239 U.S. 33, 39, 36 S.Ct. 7, 9, 60 L.Ed. 131, 134 (1915); Takahashi v. Fish & Game Commission, 334 U.S. 410, 420, 68 S.Ct. 1138, 1143, 92 L.Ed. 1478, 1487 (1948); Graham v. Richardson, 403 U.S. 365, 371, 91 S.Ct. 1848, 1851, 29 L.Ed.2d 534, 541 (1971); Sugarman v. Dougall, 413 U.S. 634, 641, 93 S.Ct. 2842, 2847, 37 L.Ed.2d 853, 859 (1973); In re Griffiths, 413 U.S. 717, 719-20, 93 S.Ct. 2851, 2853-54, 37 L.Ed.2d 910, 913-14 (1973). Since a lawfully admitted resident alien is a "person" within the protection of the Fourteenth Amendment, a statute which puts him in a class with less privileges than a citizen of the state requires close *1169 judicial scrutiny. Graham v. Richardson, supra, 403 U.S. at 371-72, 91 S.Ct. at 1851-52, 29 L.Ed.2d at 541. As Mr. Justice Blackmun said in Graham, "[a]liens as a class are a prime example of a `discrete and insular' minority (see United States v. Carolene Products Co., 304 U.S. 144, 152-153, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)) for whom such heightened judicial solicitude is appropriate." 403 U.S. at 372, 91 S.Ct. at 1852, 29 L.Ed.2d at 542.[4] Since the classification is invidious on its face, "close judicial scrutiny" would require us to find a compelling justification for the statute. See In re Griffiths, supra, 413 U.S. at 721-22, 93 S.Ct. at 2854-55, 37 L.Ed.2d at 915 (Powell, J.).
The Supreme Court in recent years has rejected certain justifications for the different treatment of resident aliens. The earlier cases, see Heim v. McCall, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206 (1915); Crane v. New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218 (1915), rested on two constitutional doctrines that were closely related. The first was that a substantial constitutional difference existed between a right and a privilege. The second was that a special public interest could support a discriminatory classification. The interrelation of the two concepts is illustrated by Judge Cardozo's reasoning in People v. Crane, 214 N.Y. 154, 108 N.E. 427 (1915). There, relying on the doctrine that special public interest permitted the exclusion of aliens from public works by a state in order to give preference to its citizens, he acknowledged that the foundation of the public interest doctrine was that "[w]hatever is a privilege, rather than a right, may be made dependent on citizenship." 214 N.Y. at 164, 108 N.E. at 430.
But as Mr. Justice Blackmun pointed out in Graham v. Richardson, supra, 403 U.S. at 374, 91 S.Ct. at 1853, 29 L.Ed.2d at 543, the Supreme Court "has rejected the concept that constitutional rights turn upon whether a government benefit is characterized as a `right' or as a `privilege'" (citing cases beginning with Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965, 970 (1963), and including Shapiro v. Thompson, 394 U.S. 618, 627 n.6, 89 S.Ct. 1322, 1327, 22 L.Ed.2d 600, 610 (1969)).
In Graham, which involved the right to welfare assistance, the Court held that even though getting enough food to live could be considered a privilege, public assistance could, nevertheless, not be denied a resident alien. The next question is obviously whether his right to work is not as much protected as his right to eat. In Sugarman v. Dougall, supra, the Court held in an eight-to-one decision (Mr. Justice Rehnquist dissenting) that New York could not constitutionally prevent resident aliens from working in the competitive class of the civil service of the state.
In Sugarman, the state at least had the argument that the civil servant participates directly in the formulation and execution of government policy, an argument that does not apply to an alien, employed by a private contractor, who paints walls. Closely scrutinizing the statute, the Court in Sugarman rejected that argument. But cf. Town of Milton v. Civil Service Commission, 312 N.E.2d 188 (Mass.1974) (durational residency requirement for police officers upheld because of necessity that policemen become familiar with the community).
The Court then turned to the state's argument that "a State constitutionally may confine public employment to citizens." 413 U.S. at 643, 93 S.Ct. at 2848, 37 L.Ed.2d at 860 (emphasis added). It decided that the "special public interest" doctrine was no more applicable to justify denial of the right to work in public employment than it had been to deny welfare assistance in Graham v. Richardson, supra.
*1170 Mr. Justice Blackmun said in language that is controlling here:
"We perceive no basis for holding the special-public-interest doctrine inapplicable in Graham and yet applicable and controlling here. A resident alien may reside lawfully in New York for a long period of time. He must pay taxes. And he is subject to service in this country's Armed Forces. . . . The doctrine, rooted as it is in the concepts of privilege and of the desirability of confining the use of public resources, has no applicability in this case. To the extent that Crane, Heim and [Ohio ex rel.] Clarke [v. Deckebach, 274 U.S. 392, 47 S.Ct. 630, 71 L.Ed. 1115 (1927)] intimate otherwise, they were weakened by the decisions in Takahashi and Graham, and are not to be considered as controlling here." 413 U.S. at 645, 93 S.Ct. at 2849, 37 L.Ed.2d at 861.
"Here" means in cases involving public employment unless the particular requirement of a specified job supports a compelling interest. See, e. g., Town of Milton v. Civil Service Commission, supra.
The Constitution means what the Supreme Court says it means at a given time. The inferior federal courts must follow, in good conscience, the doctrines expounded by the Court. Constitutional law depends not on precise verbiage but on the evolution of doctrine to fit the times. It is not the function of the inferior federal courts to declare new doctrines or to find new meaning in the Constitution unless the controversy compels it. At the same time it is not the function of the federal courts to rely on older precedents based on articulated premises which have since been rejected in later decisions. See Healy v. Edwards, 363 F.Supp. 1110, 1117 (E.D.La.1973) (three-judge court), vacated and remanded to consider possible mootness, 421 U.S. 772, 95 S.Ct. 2410, 44 L.Ed.2d 571 (1975). Crane and Heim are not simply moribund; we believe they are dead. Otherwise the results in Graham and Dougall could not have been reached.
The issue before us is not whether the New York statute can survive constitutional attack based on the Crane-Heim approach but whether the later cases of Graham, Dougall and In re Griffiths can properly be distinguished.
The determination of whether there is a constitutional distinction between a "preference" and an "exclusion" cannot be based on the superseded doctrine of Crane. The state has a duty to all its lawful residents, resident alien or citizen. It must try to see to it that they do not starve, that they have equal access to state public employment, as well as membership in the Bar, and that they have equal access to private employment. Truax v. Raich, supra. Its duty to reduce unemployment is as much a duty to the alien as to the citizen for the very reasons stated by Mr. Justice Blackmun and Mr. Justice Powell. See State v. Wylie, 516 P.2d 142, 149 (Alaska 1973).[5] Discrimination against a class of "persons" (resident aliens) who are house painters has even less justification to support it than discrimination against the same class (resident aliens) for managerial positions in the civil service.
Once the class is "suspect" its separate classification invites as close judicial scrutiny as would racial or religious discrimination. One could scarcely contend that a state might grant a "preference" in public employment to whites over blacks or Protestants over Catholics, or perhaps even to men over women, because of the problem of unemployment.
Nor can the contention be sustained that because others than resident aliens, namely, citizens with less than twelve months residence, are also not preferred for employment, the statute is saved. It is probably true that most statutes which discriminate against aliens discriminate against them exclusively. *1171 But the addition of another wrong can hardly make a right. Shapiro v. Thompson, supra, determined that a twelvemonth durational residency requirement for receipt of welfare benefits infringed the constitutionally protected right to travel, and while we need make no determination on the matter here, there is no reason to suppose that New York has a right to impede the employment of a New Jersey citizen who has recently moved to New York.[6] See York v. State, 53 Hawaii 557, 498 P.2d 644 (1972); State v. Wylie, supra (preference in public hiring based on residence held unconstitutional).
The cases upholding veterans' preference for appointments to civil service jobs are distinguishable. There is a compelling public interest to "compensate [veterans] in some measure for the disruption of a way of life . . . and to express gratitude for such [military] service." Russell v. Hodges, 470 F.2d 212, 218 (2 Cir. 1972) (Friendly, J.). There is no basis comparable to military service to support a preference in employment for a citizen against a resident alien.
We follow the principle recognized by the three-judge court in Dougall v. Sugarman, 339 F.Supp. 906, 909 (S.D.N.Y.1971), where Judge Tenney boldly took the position:
"Taken together, Graham and Takahashi sufficiently weaken the value of Crane and Heim as precedents for upholding state laws denying aliens government employment, and, therefore, those cases can be viewed as implicitly overruled and no longer law."[7]
We think his prophetic judgment was sustained by the Supreme Court in their affirmance.

II
The Court held in Graham v. Richardson, supra, 403 U.S. at 376-80, 91 S.Ct. at 1854-56, 29 L.Ed.2d at 544-46, that the discriminatory classification by the states of lawfully resident aliens with regard to welfare violates the Supremacy Clause, U.S. Const., art. VI, cl. 2, since immigration and regulation of aliens is vested exclusively in the federal government. As the Court said in Takahashi v. Fish & Game Commission, supra, 334 U.S. at 419, 68 S.Ct. at 1142, 92 L.Ed. at 1487, "[the states] can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." The Court in Graham emphasized that "aliens lawfully within this country have a right to enter and abide in any State in the Union `on an equality of legal privileges with all citizens under non-discriminatory laws.' Takahashi, 334 U.S. at 420, 68 S.Ct. at 1143, 92 L.Ed. at 1487." 403 U.S. at 378, 91 S.Ct. at 1855, 29 L.Ed.2d at 545.[8] See also Truax v. Raich, supra, 239 U.S. at 42, 36 S.Ct. at 11, 60 L.Ed. at 135. And the Court recently, in upholding a California statute barring employment of aliens not entitled to lawful residence in the United States against a claim that it violated the Supremacy Clause, noted that "[o]f course, state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it *1172 imposes additional burdens not contemplated by Congress." DeCanas v. Bica, 424 U.S. 351 n.6, 96 S.Ct. 933, 938, 47 L.Ed.2d 43, 50 (1976) (emphasis added). We agree with Judge Tenney's reasoning in Dougall v. Sugarman, supra, 339 F.Suppp. at 910-11, where he relied on the Supremacy Clause as well as the equal protection clause of the Fourteenth Amendment to strike down a statute which discriminated against permanent resident aliens in civil service employment. See also Purdy & Fitzpatrick v. State, 71 Cal.2d 566, 571-77, 79 Cal.Rptr. 77, 81-85, 456 P.2d 645, 649-53 (1969) (rejecting the argument that conditions of unemployment in the state validated discrimination against lawfully admitted aliens).
We can see no valid distinction between the arguments so ably presented by the Assistant Attorney General in this case and the arguments she made before the Supreme Court in Sugarman v. Dougall, supra.
The defendant public officers and the Board of Education will be enjoined from cancelling contracts with the plaintiffs and will be permanently enjoined from enforcing Section 222 of the New York Labor Law and the regulations promulgated thereunder insofar as they grant a preference in employment to citizens over aliens who are lawfully admitted residents.
SO ORDERED.
NEAHER, District Judge (concurring).
Although Section 222 of the New York Labor Law, as amended, was undoubtedly a well-intentioned effort to alleviate unemployment among New York citizens, it cannot withstand constitutional scrutiny because of its failure to distinguish between lawfully resident aliens and those who are not, as Judge Gurfein so cogently explains. I simply wish to add my view that the statute unfortunately discriminates impermissibly not only against lawfully resident aliens but also against citizen businessmen of the State.
The plaintiffs here include not only lawfully resident aliens but also domestic corporations owned and operated by New York citizens. Section 222 denies them the right to bid for and perform public work contracts solely because they employ such aliens. Business corporations such as plaintiffs although not citizens are "persons" and thus entitled to equal protection of the laws under the Fourteenth Amendment. Grosjean v. American Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660, 665 (1936); Safeguard Mutual Insurance Co. v. Miller, 472 F.2d 732, 733 (3 Cir. 1973). They may not be subjected to arbitrary regulations which interfere with their ordinary and lawful business operations.
Even though the plaintiff corporations may be free to deny employment to aliens, see, e. g., Espinoza v. Farah Manufacturing Company, Inc., 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), a general rise in the level of unemployment due to adverse economic conditions does not provide even a rational basis, let alone a compelling reason for the State to penalize them as employers of alien labor in the manner prescribed by § 222. In the first place, such economic conditions are obviously beyond their control. Secondly, those conditions are as likely to bring unemployment to aliens as to citizens, if not more so. Thirdly, from the standpoint of State revenues, the State benefits from the employment of all residents, regardless of citizenship.
Of course the State has both an interest and a responsibility to promote conditions that will bring maximum employment opportunities to all lawful residents. In awarding public works contracts, however, the State's primary interest is to ensure that the work is performed efficiently, competently and at the lowest cost to the public treasury. Section 222 is not at all concerned with the achievement of those objectives but only with the citizenship status of those who will do the work. That basis of distinction is purely arbitrary and no longer permissible under the authorities cited by Judge Gurfein.
*1173 PLATT, District Judge (dissenting).
From 1909 through 1915 the predecessor to § 222, viz: Section 14 of the New York Labor Law, provided that
"§ 14. Preference in employment of persons upon public works.

In the construction of public works by the state or a municipality, or by persons contracting with the state or such municipality, only citizens of the United States shall be employed; and in all cases where laborers are employed on any such public works, preference shall be given citizens of the state of New York. In each contract for the construction of public works a provision shall be inserted, to the effect that, if the provisions of this section are not complied with, the contract shall be void * * *". (Emphasis added).
Section 14 was amended by Act of March 11, 1915 to provide that
"In the construction of public works by the state or a municipality, or by persons contracting with the state or such municipality, preference shall be given to citizens over aliens. Aliens may be employed when citizens are not available * * *". (Emphasis added).
In a case involving the first version of the statute, i. e., where employment of aliens upon public works was prohibited, and in the face of an argument that such statute was unconstitutional in that it denied to the plaintiffs the equal protection of the law afforded by the Fourteenth Amendment to the Constitution, the Supreme Court of the United States held that "the Labor Law of New York and its threatened enforcement do not violate the 14th Amendment or the rights of plaintiffs in error thereunder * * *". Heim v. McCall, 239 U.S. 175, 194, 36 S.Ct. 78, 84, 60 L.Ed. 206, 218 (1915). This case was immediately followed by Crane v. New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218 (1915) wherein the Supreme Court reaffirmed its holding in the Heim case and held further that a distinction made between aliens and citizens does not violate "the principle of classification", in that there was an adequate basis for such a distinction and classification. The Crane case also held that the enforcement of said law did not deprive plaintiffs and his employees of liberty and property without due process of law.
The majority today holds that the Crane and Heim cases were declared to have been "weakened" and "not to be considered as controlling here" by the Supreme Court in Sugarman v. Dougall, 413 U.S. 634, 644-646, 93 S.Ct. 2842, 2849, 37 L.Ed.2d 853, 861 (1973), and that such conclusion was foretold in Graham v. Richardson, 403 U.S. 365, 376, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534, 544 (1971); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Takahashi v. Fish & Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); and see also In re Griffiths, 413 U.S. 717, 721-722, 729, 93 S.Ct. 2851, 2854-2855, 2858, 37 L.Ed.2d 910, 915, 919 (1973); Ramos v. U. S. Civil Service Commission, 376 F.Supp. 361 (D.Puerto Rico 1974).
Each of these cases, however, dealt with a prohibition against aliens, not a preference with respect to them as is the situation in the case at bar under the current version of the New York Statute. This factor alone is sufficient to distinguish this case from those cases.
Classifications based on nationality may well be "inherently suspect and subject to close judicial scrutiny," Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534, 541 (1971), and further "a State which adopts a suspect classification [may] `bear[s] a heavy burden of justification,' * * * [and] in order to justify the use of a suspect classification, a State [may have to] show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is `necessary * * * to the accomplishment' of its purpose or the safeguarding of its interest", In re Griffiths, 413 U.S. 717, 721-22, 93 S.Ct. 2851, 2855, 37 L.Ed.2d 910, 915 (1973) (footnotes omitted). But the fact remains that the very same U.S. Supreme Court has specifically held in dealing with the predecessor of the statute in question *1174 in a more "invidious" form that the view that it violated the principle of classification was "without foundation". (Crane v. New York, 239 U.S. at p. 198, 36 S.Ct. at p. 85, 60 L.Ed. at p. 225). If Heim and Crane are to be overruled, the Supreme Court itself should do it. As was stated in Salerno v. American League of Professional Baseball Clubs, 429 F.2d 1003, 1005 (2d Cir. 1970), cert. denied, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971):
"[T]he Supreme Court should retain the exclusive privilege of overruling its own decisions, save perhaps when opinions already delivered have created a near certainty that only the occasion is needed for pronouncement of the doom."
See also: United States v. Karathanos, 531 F.2d 26, 31 (2d Cir. 1976).
I am not unmindful of the alleged destruction of the underpinning of Crane and Heim, i. e., the so-called public interest doctrine theory, and of the "trend of the law" as indicated in the more recent cases cited by the plaintiffs but I do not feel that we should be expected to override in this case so definitive a position taken by the Supreme Court.
This is particularly true where we are asked to apply a judicial veto to a statute whose objectives have for generations been considered appropriate and necessary by the duly elected representatives of the people of the sovereign State of New York. Much lip service is given to the responsibility of state and local governments to alleviate their own unemployment problems, and to the undesirability of turning to the federal government for cures to such ills. At the same time the federal government has failed to remove the burdens placed on states by welfare and other costs even though the logic of Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), would indicate that those burdens would more sensibly be placed on the central government. Until corrections are made in this area, it is premature to overrule Crane and Heim, for that step would make it more difficult for the states to perform public assistance tasks.
It stands to reason that if the State of New York enacts legislation creating and funding additional jobs and makes them available to all comers at a time when unemployment is widespread (as it is today) there will be an influx of non-New Yorkers, both citizens and aliens, seeking such jobs and New York's desirable objective of eliminating unemployment within its borders will have been frustrated and defeated despite considerable taxpayer expense. Common sense told the State legislators, and it tells this writer, that this course merely compounds, and in no way alleviates, the problem which New York is legitimately and properly attempting to correct, and that it can only discourage New York and other states from taking any action to reduce unemployment.
In short, equal opportunity between citizens and aliens for jobs created by Congressional legislation to alleviate unemployment on a nationwide basis may make some sense (assuming arguendo one wants to draw no distinction between an alien and a citizen other than the right to vote). But the application of such a doctrine to frustrate and defeat a state's attempt to solve the pressing local problems it faces under presently existing laws and conditions is nothing but theoretical and unrealistic and can in reality only be considered harmful.
Moreover, if mere labels such as "suspect classification", "invidious discrimination", etc., are put aside and the situation viewed with some objectivity, there are two good legal grounds on which this statute may be sustained; first, in that the statute now does not just give preferences to persons other than aliens but provides for a carefully developed plan which gives preferences even to various groups of New York residents as against other groups of New York residents, and second, in that statutory preferences to various deserving groups have heretofore been sustained by the courts in the face of equal protection challenges.
With respect to the first of such grounds, the majority say in essence that two wrongs do not make a right. That, however, is not *1175 an answer because it is not a "wrong" under the federal Constitution for a State, for example, to provide jobs for residents of one area of the state which has suffered from heavy lay-offs and unemployment and not to those of another more affluent area. The preference here is, as indicated, merely part of a comprehensive, realistic plan to solve a pressing economic problem. Clearly states should have the power to develop carefully considered plans to alleviate unemployment, and differentiate between eligible persons therefor on a preferential basis only, so long as they do not single out and discriminate against a particular group. New York has designed and enacted just such a plan in its present statute. I note that the Supreme Court in Takahashi (and in Sugarman) merely held that "the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits", 334 U.S. at p. 420, 68 S.Ct. at p. 1143, 92 L.Ed. at p. 1488, 413 U.S. at p. 642, 93 S.Ct. at 2847, 37 L.Ed.2d at 859 (emphasis added). It did not hold that non-exclusive preferences as a part of general plan to reduce unemployment of the sort involved here were prohibited, "suspect", "invidious", or anything else.
In my view, then, what saves this statute is the fact that it represents a reasonable and logical attempt and plan to cure a real and present economic evil which has been thrust upon the State of New York in part by congressional inaction and in part by past mandates of the federal courts.
As to the second ground, particular attention should be paid to the tuition cases, e. g., Sturgis v. Washington, 368 F.Supp. 38 (W.D.Wash.), aff'd 414 U.S. 1057, 94 S.Ct. 563, 38 L.Ed.2d 464 (1973), and Starns v. Malkerson, 326 F.Supp. 234 (D.Minn.1970), aff'd 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971). Those cases can only be read as holding that a state may limit receipt of public moneys or benefits (other than the necessities of life, see Shapiro v. Thompson, supra) to those who meet reasonable requirements that demonstrate their status as bona fide members of the commonwealth. The obvious intent of tuition provisions like those at issue in Sturgis and Starns is to discourage the exploitation of the state treasury by those from outside the commonwealth, which exploitation can discourage and render futile efforts by the state to solve its social problems. See also August v. Bronstein, 369 F.Supp. 190 (S.D.N.Y.), aff'd 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974) and Russell v. Hodges, 470 F.2d 212 (2d Cir. 1972).
For these reasons I would adhere to the decisions heretofore made by the United States Supreme Court with respect to Section 222's predecessor and hold such Section constitutional, particularly as set forth in its present form.
I feel that there is little merit to plaintiffs' remaining arguments. I see no interference with regulations by Congress of or with respect to immigration and naturalization. New York in Section 222 has imposed no burden upon the entrance or residence of aliens in New York or elsewhere within the United States. It has merely not provided an added attraction which might tempt aliens or others who are non-residents of New York to move from places in which they presently reside to New York.
Moreover, the writer sees nothing in the Immigration and Nationality Act of 1952, 8 U.S.C. § 1101, et seq., which pre-empts the field with respect to the employment of aliens and citizens in New York or on a nationwide basis or precludes New York or any other state from dealing with the problem involved here in the manner which New York has selected. Again, if Congress wishes to enact legislation, dealing with unemployment on a nationwide basis, affording equal opportunity to citizens and aliens alike, or if it wishes to assume responsibility for all welfare costs, etc., the way is clearly open to it to do so but in the meanwhile one must be practical and sensible and deal with the problem at hand given the existing laws, facts and circumstances.
The majority seeks comfort in a footnote in the recent Supreme Court opinion in DeCanas v. Bica, 424 U.S. 351, 96 S.Ct. *1176 933, 47 L.Ed.2d 43, 44 U.S.L.W. 4235 (1976), viz.:
"Of course, state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress," 424 U.S. at 358 n.6, 96 S.Ct. at 938, 47 L.Ed.2d at 50.
but I respectfully submit that they mistake the purpose and effect of the present statute. No "discrimination" or "burden" is intended or effected. A preferential benefit only is conferred upon a limited, and needy, group, in particular areas within the State and for limited periods of time, with consequent limited additions to the State's pressing budgetary problems. It is not a "burden" or a "discrimination" to say that the remaining State residents and non-residents (including aliens) are not entitled to the same benefits if they move into the depressed areas. Carried to its logical conclusion, the reasoning of the majority would lead us to hold that all benefits to one depressed area or even a needy group of citizens add a "burden" and "discriminate" against all other areas or groups within the State. In addition State graduated income taxes, marital deductions, emergency aid to particular cities (New York, Yonkers, etc.) would fall under the sweeping language of the United States Constitution so interpreted. The results in my opinion would be intolerable.
The same analysis indicated above, suggesting that the preferential treatment of native students in the tuition cases did not constitute a discrimination which violated the Equal Protection Clause, applies here as well. To grant a job, to lower tuition, to reduce taxes, to give veteran's benefits  these are not in a practical sense the imposition of "burdens" on those not affected. Failure to grant a benefit is not identical in such situations with imposing a burden. That no burden is imposed by the statute means that it does not fall afoul of the pre-emption doctrine. Nothing in the Immigration and Nationality Act, as I read it, was meant to prevent action of the sort New York has taken to create employment for its needy citizens. Nothing in the Act was "intended to preclude even harmonious state regulation touching on aliens in general, . . ." DeCanas v. Bica, 424 U.S. 351, 358, 96 S.Ct. 933, 937, 47 L.Ed.2d 43, 50 (1976).
There is similarly little merit to plaintiffs' contention that Section 222 constitutes an interference with an alien's or a non-resident's inherent right to travel. The fact that a State does not hold out an inducement to out-of-staters to come into the State cannot reasonably be said to penalize such out-of-staters' right to travel. Cf.: Crandall v. Nevada, 73 U.S. (6 Wall.) 35, 18 L.Ed. 744 (1868); Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941).
Finally, even if the argument should be accepted (and I do not of course believe that it should be) that the current New York plan is invalid because aliens are treated differently from similarly situated non-aliens (e. g., non-resident citizens), it would nevertheless not to my mind follow that the entire statutory scheme in question should fall. Nothing in the cases cited to us indicates that it is impermissible for a State to grant preferences to residents in distributing public assistance (except, perhaps, for essentials) so long as subdivisions are not created among the non-residents. That is, I believe that New York without doubt can use its public works money to hire first all aliens and American citizens who have resided in New York for a specified period, and then consider all non-New York residents for positions that remain. And of course nothing prevents preferences from being given to residents of one New York city over those of others. Under such a scheme, there would be no differentiation between non-New York American citizens and aliens. The only distinction drawn would be between bona fide New York  or New York subdivision  residents (aliens and non-aliens alike), and non-residents. Such a rational response to the State's social problems could not, as I see it, be considered a violation of the Equal Protection *1177 Clause or a deprivation of any fundamental liberty. At most, then, all New York need do to render its statute less susceptible to attack is provide that aliens, like non-New York American citizens, become eligible for the employment preferences after they reside for the requisite period of time in the State. I do not read the opinions of Judges GURFEIN and NEAHER to say anything to the contrary.
For the foregoing reasons, plaintiffs' motions for preliminary injunctions should be denied and plaintiffs' complaints should be dismissed.
NOTES
[1] Section 222, prior to the 1975 amendment, provided as follows:

In the construction of public works by the state or a municipality, or by persons contracting with the state or a municipality, preference shall be given to citizens of the state of New York who have been residents for at least six consecutive months immediately prior to the commencement of their employment. Each person so employed shall furnish satisfactory proof of residence, in accordance with rule adopted by the industrial commissioner. Persons other than citizens of the state of New York may be employed when such citizens are not available. In each contract for the construction of public works a provision shall be inserted that if this section is not complied with, the contract shall be void. All boards, officers, agents or employees of cities having a population of one hundred seventy-five thousand or more according to the last state enumeration or federal census having the power to enter into contracts which provide for the expenditure of public money on public works, shall file in the office of the department the names and addresses of all contractors holding contracts with said cities. Upon the demand of the commissioner a contractor shall furnish a list of the names and addresses of all his subcontractors. Each contractor and subcontractor performing public works shall keep a list of his employees, stating whether they are citizens of the state of New York, native born citizens or naturalized citizens and in case of naturalization, the date thereof, and the name of the court in which granted. A violation of this section shall constitute a misdemeanor and shall be punishable by a fine of not less than fifty dollars nor more than five hundred dollars, or by imprisonment for not less than thirty nor more than ninety days, or by both fine and imprisonment.
[2] As amended, § 222 now provides in full as follows:

In the construction of public works by the state, a municipal subdivision including a school district, or a state or municipal public benefit corporation, authority or commission or any agency entering into public works projects providing for the expenditure of public money or by persons contracting with the state, a municipal subdivision including a school district, or a state or municipal public benefit corporation, authority or commission, or any agency entering into public works projects providing for the expenditure of public money, preference in employment shall be given to citizens of the state of New York who have been residents of the state for at least twelve consecutive months immediately prior to the commencement of their new employment. In addition to the foregoing provisions, whenever the unemployment rate in a statistical metropolitan sampling area (SMSA) in New York state is determined by the federal Labor Board Bureau of Labor Statistics to be six per centum or more for a period of three consecutive months, such preference in employment on public works projects in that SMSA shall be given first to the qualified citizens of the state of New York who have been residents of such SMSA for twelve consecutive months prior to the commencement of their employment, said preference to continue until such time as the unemployment rate for such SMSA as so established shall be below six per centum for three consecutive months. The provisions of this section shall not be applicable to any such corporation, authority or commission whose existence and jurisdiction is fixed by compact, treaty, action or agreement with other states or nations. Each person so employed shall furnish satisfactory proof of residence and qualification in their trade or skill, in accordance with rule adopted by the industrial commissioner. Persons other than citizens of the state of New York or residents of such SMSA may be employed when such citizens or residents are not available. In each contract for the construction of public works a provision shall be inserted that if this section is not complied with, the contract shall be void. All officers, agents or employees of the public entities set forth in the foregoing, having the power to enter into contracts which provide for the expenditure of public money on public works, shall file in the office of the department the names and addresses of all contractors holding contracts with such public entities, together with a description of the work and its location. The commissioner shall require each contractor to furnish a list of the names and addresses of all his subcontractors. Each contractor and subcontractor performing public works shall keep a list of his employees, stating whether they are citizens of the state of New York, native born citizens or naturalized citizens and in case of naturalization, the date thereof, and the name of the court in which granted, a copy of which shall be filed in the office of the department. All information required to be filed pursuant to this section shall be filed in accordance with the rules of the industrial commissioner. All of the data and information required by this section to be filed with the department shall be available for public inspection and copying, subject to and in accordance with the provisions of article six of the public officers law, constituting the freedom of information law. A violation of this section shall constitute a misdemeanor and shall be punishable by a fine of not less than fifty dollars nor more than five hundred dollars, or by imprisonment for not less than thirty nor more than ninety days, or by both fine and imprisonment.
[3] The only point raised by plaintiffs is with regard to discrimination against Vlachos as an alien, not as a non-resident of the SMSA. We do not consider the constitutionality of the statute in the latter respect.
[4] Paradoxically, the New York Legislature has enacted the principle that "[t]he opportunity to obtain employment without discrimination because of age, race, creed, color, national origin, sex or marital status is hereby recognized as and declared to be a civil right." N. Y. Executive Law § 291(1) (McKinney Supp.1975). The term "persons" in the New York Human Rights Law includes "individuals." Id. § 292(1) (McKinney 1972). "Citizenship" is nowhere mentioned. See id. §§ 290-301.
[5] The state makes no claim that the employment of resident aliens would undercut wage scales, for in New York, contractors on public works are required to pay no less than "the prevailing rate of wages." N.Y. Labor Law § 220(3) (McKinney Supp.1975).
[6] In the case at bar, all the aliens involved have resided in New York State for more than twelve months. Hence they are barred from public employment only because they are aliens.
[7] Judge Lumbard, concurring, agreed that "the `special public interest' doctrine and the Court's earlier decisions in [Heim] and [Crane] can no longer be viewed as controlling in light of the Court's language in [Graham] and [Takahashi]." 339 F.Supp. at 911. The Supreme Court of California, as early as 1969, held that a statute excluding aliens from public employment could not be upheld under Heim because in Takahashi, supra, "the United States Supreme Court dealt a death blow to the `proprietary' rationale as a justification for exclusion of aliens from certain occupations." Purdy & Fitzpatrick v. State, 71 Cal.2d 566, 584, 79 Cal.Rptr. 77, 89, 456 P.2d 645, 657 (1969).
[8] Mr. Justice Harlan concurred in Part III of the Graham opinion which held the New York statute invalid under the Supremacy Clause, making the Court unanimous on this point.